FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2020 JAN 24 PM 3: 11

CLERK_____
SO. DIST. OF GA.

**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

MONICA WILLIAMS,                    )
                                    )
    Plaintiff,                      )
                                    )
v.                                  )    CASE NO. CV418-198
                                    )
HOUSING AUTHORITY OF SAVANNAH,      )
                                    )
    Defendant.                      )
_____)

## O R D E R

Before the Court is Defendant Housing Authority of Savannah's ("HAS") Motion for Summary Judgment. (Doc. 12.) For the following reasons, Defendant's motion is **GRANTED**. As a result, Plaintiff's claims are **DISMISSED**. The Clerk of Court is **DIRECTED** to close this case.

### BACKGROUND

Plaintiff Monica Williams is a female who was formerly employed as an Assistant Asset Manager for Defendant from June 2017 to February 2018.[1] (Doc. 24, Attach. 1 at 2.) During this time period, Plaintiff helped manage several of Defendant's properties, including the River Pointe I and River Pointe II apartment complexes. (Id. at 2.) The River Pointe properties are former

---

[1] Because the Court is considering Defendant's Motion for Summary Judgment, the Court will consider the facts in the light most favorable to Plaintiff. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

public housing units that Defendant converted into Rental Assistance Demonstration ("RAD") housing, a program created by the United States Department of Housing and Urban Development ("HUD").[2] (Doc. 13 at 1.)

At the time she worked for Defendant, Plaintiff worked in Defendant's office located at 200 East Broad Street in Savannah, Georgia, however, Defendant's main office, the Neighborhood Resource Center ("NRC"), is located at 1407 Wheaton Street. (Doc. 12, Attach. 2 at 5-7.) Plaintiff mainly reported to Kim-Nee Stewart, Asset Manager for the River Pointe I and River Pointe II properties. (Doc. 12, Attach. 3 at 4; Doc. 24, Attach. 1 at 2.) As an assistant asset manager, Plaintiff's duties included inspecting apartments and completing recertification paperwork for residents. (Id.) Inspecting apartments involved identifying problems such as "mold, leaks, AC, flooring, anything that would be blocking

---

[2] In 2012, Defendant selected Hunt Development Group, LLC ("Hunt") to develop and renovate the River Pointe properties into RAD housing properties. (Id.) In turn, Hunt created Wessels/Blackshear Redevelopment, LP ("Wessels/Blackshear") and, in June 2016, Defendant sold the River Pointe apartment buildings to Wessels/Blackshear. (Id.) Additionally, Wessels/Blackshear hired Empire Construction of Tennessee, Inc. ("Empire") to perform renovations on the River Pointe properties. (Id. at 2.) Empire hired various subcontractors to perform the work, including Roger Salazar. (Doc. 12, Attach. 1 at 5; Doc. 14 at 3.) After these exchanges, Wessels/Blackshear entered into a Management Agreement with LEDIC Property Management ("LEDIC"). (Doc. 13 at 2.) Subsequently, LEDIC delegated most of the managerial duties of the River Pointe properties to Defendant in a Sub-Management Agreement. (Id.)

windows, cleaning standards, [and] anything that needed to be fixed." (Id. at 8.) To give Plaintiff access to apartments, Defendant gave Plaintiff a set of master keys that opened all River Pointe I and River Pointe II apartments, the heating, ventilation, and air conditioning ("HVAC") closets in each apartment, and several office doors.[3] (Id. at 12.) Plaintiff did not share her set of keys with anyone else. (Id.) When Plaintiff was given the keys, Plaintiff was told she "was responsible for [her] keys and don't let them out of [her] sight." (Id. at 13.)

On February 2, 2018, Plaintiff and three other individuals were inspecting the River Pointe I apartments. (Doc. 24, Attach. 1 at 3.) The individuals inspecting apartments with Plaintiff included: (1) Robert Marshall, Director of Facilities Maintenance; (2) Rafaella Gavino, a real estate analyst; and (3) Roger Salazar, a subcontractor hired by Empire to work on the River Pointe properties.[4] (Id.) As the group was walking around the property, Plaintiff alleges that Mr. Salazar said Plaintiff's butt was cute, she was pretty, and she had a sexy walk. (Doc. 12, Attach. 2 at 21.) Plaintiff also alleges that Mr. Marshall said she was pretty and to "look at her heels." (Id.) Plaintiff claims she asked Ms.

---

[3] According to Plaintiff, these keys also opened a third set of RAD housing units managed by Defendant. (Doc. 12, Attach. 2 at 12.)

[4] After the incident at issue, Rafaella Gavino started using her maiden surname, Nutini. (Doc. 14 at 5.) For purposes of this motion, the Court will refer to her as Ms. Gavino.

Gavino to "tell them to stop . . . ." (Id. at 21-22.) According to Plaintiff, Mr. Salazar and Mr. Marshall stopped making comments after Ms. Gavino told them to stop.[5] (Id. at 23.)

After this conversation, the group split up into pairs—Mr. Marshall and Mr. Salazar inspected upstairs units and Plaintiff and Ms. Gavino inspected downstairs units. (Id. at 23.) In one unit, Plaintiff used her keys to open a HVAC closet and was unable to close the door. (Doc. 24, Attach. 1 at 3.) Plaintiff alleges that she told Mr. Marshall she could not close the door and he instructed her to give her keys to Mr. Salazar so he could close it. (Id. at 4.) Plaintiff alleges that she refused to give her keys to Mr. Salazar because it was against Defendant's policies. (Doc. 12, Attach. 2 at 26.) Plaintiff claims that, in response, Mr. Marshall said he was Plaintiff's boss and to give Mr. Salazar the keys. (Id.) After Plaintiff refused again, Plaintiff claims that Mr. Salazar came from behind her, tried to grab the keys, and attempted to kiss Plaintiff's face. (Id.) Plaintiff then "hit [Mr. Salazar] a couple times" and told him to not ever touch her again.

---

[5] Although Plaintiff alleges that Mr. Marshall made comments about her appearance and that she asked Ms. Gavino to tell Mr. Salazar and Mr. Marshall to stop, Ms. Gavino testified that Plaintiff did not ask her to do anything and that Mr. Marshall did not make any comments to Plaintiff. (Doc. 12, Attach. 6 at 7.) However, the Court will not make credibility determinations and, because Defendant is moving for summary judgment, will view the facts in the light most favorable to Plaintiff.

(Id.) Subsequently, Plaintiff gave Mr. Salazar her keys. (Id. at 27.)

Mr. Marshall did not see Mr. Salazar's attempt to kiss Plaintiff. (Id.; Doc. 12, Attach. 5 at 7.) Plaintiff testified that as Mr. Marshall walked from the upstairs unit, Ms. Gavino told him that Mr. Salazar attempted to kiss Plaintiff.[6] (Doc. 24, Attach. 1 at 10.) Plaintiff testified that in response Mr. Marshall said that Mr. Salazar and Plaintiff might "need[] a private moment." (Id.) Plaintiff alleges that Mr. Salazar then walked away with her keys. (Doc. 12, Attach. 2 at 27.)

Plaintiff testified that she returned to her office at some time after 4:00 p.m. (Id. at 29.) At the office, Plaintiff informed Kim Smith, another assistant asset manager, about Mr. Salazar's attempt to kiss her. (Id.) Plaintiff testified that Ms. Smith told Plaintiff to report the incident to Defendant's Human Resources ("HR") Department. (Id.) Plaintiff testified that, after speaking with Ms. Smith, she spoke with Mr. Marshall about the incident. (Id.) Plaintiff then went to the NRC with the intention of reporting the incident to HR, but the NRC was closed for the day. (Id.)

---

[6] Mr. Marshall testified that the first he heard of the incident was when Mr. Salazar told Mr. Marshall about it as the group was walking back to the office. (Doc. 12, Attach. 5 at 8.) However, the Court will consider Plaintiff's version of the facts for purposes of this motion.

After going to the NRC, Plaintiff called her direct supervisor, Ms. Stewart, and reported the incident. (Id.) Ms. Stewart testified that after Plaintiff called her, Ms. Stewart immediately reported the incident to Douglas Reed, Director of Human Resources. (Doc. 12, Attach. 3 at 7.) Ms. Stewart also testified that Mr. Reed told her he would follow up with Plaintiff. (Id. at 8.) On the same day, Plaintiff sent an e-mail to one of Empire's contractors about the incident. (Id. at 25.) Subsequently, Empire sent an e-mail to Ms. Stewart about the incident. (Id.)

At 10:16 a.m. on February 5, 2018, Ms. Stewart sent an e-mail to Mr. Reed, Mr. Marshall, and Earline Davis, Executive Director, about Plaintiff's e-mail to an Empire contractor. (Id.) Immediately after sending this e-mail, at 10:47 a.m., Ms. Stewart sent another e-mail to Mr. Marshall, Mr. Reed, and Ms. Davis informing them that a resident of River Pointe I returned a "spare set of Master keys" that were left in her apartment during inspections on February 2, 2018.[7] (Id. at 27.) Ms. Stewart stated that the keys were Plaintiff's and that Plaintiff had not reported her keys missing. (Id.) In response to Ms. Stewart's e-mail, Ms.

---

[7] In her e-mail, Ms. Stewart claims that the resident identified the keys as Plaintiff's (Doc. 12, Attach. 3 at 27), but Ms. Stewart later testified that the resident did not identify Plaintiff, but merely described her appearance (Id. at 12). However, Plaintiff does not dispute that the keys found were hers.

Davis sent an e-mail stating that Plaintiff leaving her keys in an apartment and not reporting them missing is "gross neglect." (Id.) Ms. Davis' e-mail then states, "[p]lease prepare [Plaintiff's] termination papers." (Id.) The next day, February 6, 2018, the resident who found Plaintiff's keys provided Ms. Stewart with a statement about finding the keys on February 2 and returning them on February 5. (Id. at 30.)

On the same day as this e-mail exchange, February 5, 2018, Plaintiff reported to the NRC for a temporary assignment.[8] That morning, Plaintiff met with Mr. Reed to discuss the incident with Mr. Salazar. (Doc. 12, Attach. 2 at 31.) Mr. Reed told Plaintiff to write an incident report. (Id.) After speaking with Mr. Reed, Plaintiff spoke with Mr. Kenneth Clark, Director of Development Services, and Mr. Clark told her that he would "look into" the incident. (Id. at 38.) Mr. Clark testified that immediately after he spoke with Plaintiff, he went to Mr. Marshall's office and the two of them called Harry Moody, Defendant's liaison to Empire. (Doc. 12, Attach. 1 at 6.) Mr. Clark testified that he requested Empire immediately remove Mr. Salazar from the River Pointe I property and requested that Mr. Salazar not contact any of

---

[8] Plaintiff believed that she was temporarily transferred to the NRC due to her complaint about Mr. Salazar. (Doc. 12, Attach. 2 at 30.) However, Ms. Stewart e-mailed Plaintiff on February 2, 2018, at 4:17 PM about working at the NRC. (Id. at 80.) Plaintiff received this e-mail prior to reporting Mr. Salazar's attempt to kiss her to Ms. Stewart.

Defendant's employees. (Id.) Additionally, Mr. Clark stated that, to the best of his knowledge, Empire did not permit Mr. Salazar to work in Savannah after February 5, 2018. (Id.)

After speaking with Plaintiff, Mr. Reed went to Ms. Gavino's office and asked her about the incident. (Doc. 12, Attach. 6 at 10-11; Doc. 24, Attach. 1 at 5.) Mr. Reed also requested that Ms. Gavino send him an e-mail detailing the incident. (Doc. 12, Attach. 6 at 10.) Mr. Reed testified that he also met with Mr. Marshall. (Doc. 12, Attach. 7 at 3.) According to Mr. Reed, Mr. Marshall said, "he did not see the incident but was told about it by [Plaintiff] and Ms. Gavino."[9] (Id.)

In Ms. Gavino's e-mail to Mr. Reed and Mr. Clark on February 6, 2018, Ms. Gavino stated that Mr. Salazar "made comments about [Plaintiff], saying to her that 'she could move in with him.' " (Doc. 12, Attach. 6 at 24.) Ms. Gavino also stated that Plaintiff responded to Mr. Salazar's comments by "expressing discomfort." (Id.) Additionally, Ms. Gavino stated that Mr. Salazar "hugged [Plaintiff] and gave her a kiss on her left shoulder" and that, in response, "[Plaintiff] immediately punched him in the chest." (Id.)

---

[9] Although Mr. Reed testified that he met with Mr. Marshall, Mr. Marshall testified that he could not recall meeting with anyone about the incident. (Doc. 12, Attach. 5 at 13.)

Plaintiff also wrote an e-mail to Mr. Reed detailing the incident with Mr. Salazar. (Doc. 12, Attach. 2 at 83.) In the e-mail, Plaintiff stated that Mr. Salazar "was blowing kisses" at her and that she told him to stop. (Id.) Additionally, Plaintiff stated that Mr. Salazar again blew a kiss at her and said she "needed a real man to come and lock the [HVAC] door for her." (Id.) Plaintiff claimed that in response to Mr. Salazar, Mr. Marshall said, "maybe Mr. [Salazar] and [Plaintiff] needed a moment." (Id.) The e-mail also states that Mr. Salazar "came behind [Plaintiff] and tried to kisses (sic) [her]" and that Plaintiff "turned and hit him twice in his arm or chest." (Id.) The e-mail does not mention that Mr. Marshall made any comments to Plaintiff about her appearance or that Mr. Marshall directed Plaintiff to give Mr. Salazar her keys. (Id.)

On February 6, 2018, Ms. Stewart and Mr. Reed prepared an interoffice memorandum notifying Plaintiff that Defendant was terminating her employment with HAS due to her losing her keys and failing to report them missing. (Doc. 12, Attach. 3 at 11, 31.) The memorandum stated

> This action is being taken because of your recent actions where you left a set of master keys in a (sic) occupied unit and never reported the keys missing. These actions demonstrate gross negligence on your part as it placed HAS at extreme risk of liability had the keys been found and used for criminal activity . . . . According to Part III, Section 3.0 [of the Personnel Policy of the Housing Authority of Savannah] this is a Class I violation and, therefore, is grounds for immediate termination . . . .

> Pursuant to Part III, Section 6.0 of the Personnel Policy
> of the Housing Authority of Savannah, you have the right
> to appeal this termination, in writing, within seven
> working days to the Executive Director, Earline Wesley
> Davis.

(Id.) On February 7, 2018, Plaintiff met with Ms. Stewart and Mr. Reed and they gave Plaintiff this termination memorandum. (Id.) Plaintiff testified that in this meeting she, for the first time, informed Mr. Reed and Ms. Stewart that Mr. Marshall directed her to give her keys to Mr. Salazar. (Doc. 12, Attach. 2 at 44.)

Plaintiff did not exercise her right to appeal her termination. (Id.) Instead, on the same day she was terminated, Plaintiff filed a charge with the United States Equal Employment Opportunity Commission ("EEOC"). (Id.) In her charge, Plaintiff claimed she "was discriminated against by being subjected to sexual harassment and in retaliation for reporting sexual harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended." (Id. at 85.) In response to Plaintiff's EEOC charge, Defendant filed a position statement acknowledging that Plaintiff "made a claim of sexual harassment on Monday, February 5, 2018 following an incident that presumably occurred on Friday, February 2, 2018." (Doc. 12, Attach. 4 at 26.) The statement also indicates that Defendant "took steps to have the accused (Roger Salazar—an employee of a subcontractor performing work for HAS) removed" from work on Defendant's property. (Id.) Additionally, the statement claims that Plaintiff told Defendant she gave her keys to Mr.

Salazar and he left them in the residence and, therefore, Plaintiff "gave access to someone who may not have the best interests in mind of those [Defendant] serve[s]." (Id.) Finally, the statement claims that Defendant investigated Plaintiff's allegation of sexual assault and "found no corroborating information that [Mr. Salazar] attempted to 'kiss' [Plaintiff]," but that he may have attempted to hug Plaintiff and that "his actions were indicative of his cultural upbringing [in Costa Rica]." (Id.)

Plaintiff filed her complaint against Defendant on August 21, 2018. (Doc. 1.) In her Complaint, Plaintiff asserts that Defendant "unlawfully discriminated against Plaintiff on the basis of her gender under Title VII when it failed to investigate her allegations and wrongfully terminated her employment" and that Defendant "unlawfully retaliated against Plaintiff on the basis of her protected activity (filing a complaint with Human Resources regarding sexual harassment) under Title VII when it terminated her employment." (Id. at 4-5.) Defendant filed its Motion for Summary Judgment on March 15, 2019. (Doc. 12.) Defendant contends summary judgment is appropriate because Plaintiff has failed to establish a prima facie case of gender discrimination or retaliation or, in the alternative, Plaintiff has failed to rebut Defendant's proffered reason for her termination. (Doc. 14.)

**ANALYSIS**

I.  STANDARD OF REVIEW

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (citing Fed. R. Civ. P. 56 advisory committee notes). Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with

12

the affidavits, if any, which it believes demonstrate
the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The burden then
shifts to the nonmovant to establish, by going beyond the
pleadings, that there is a genuine issue as to facts material to
the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604,
608 (11th Cir. 1991). The Court must review the evidence and all
reasonable factual inferences arising from it in the light most
favorable to the nonmovant. Matsushita, 475 U.S. at 587-88, 106 S.
Ct. at 1356. However, the nonmoving party "must do more than simply
show that there is some metaphysical doubt as to the material
facts." Id., 475 U.S. at 586, 106 S. Ct. at 1356. A mere "scintilla"
of evidence, or simply conclusory allegations, will not suffice.
See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th
Cir. 1998). Nevertheless, where a reasonable fact finder may "draw
more than one inference from the facts, and that inference creates
a genuine issue of material fact, then the Court should refuse to
grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-
34 (11th Cir. 1989).

II.  GENDER DISCRIMINATION

In her complaint, Plaintiff contends that she was subjected
to gender discrimination in violation of Title VII of the Civil
Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. when Defendant
"failed to investigate her allegations and wrongfully terminated

13

her employment." (Doc. 1 at 4.) Defendant argues that Plaintiff's gender discrimination claim fails because she cannot establish a prima facie case. (Doc. 14 at 20.) In the alternative, Defendant argues that Plaintiff cannot establish that Defendant's legitimate, non-discriminatory reason for terminating Plaintiff's employment was pretext for gender discrimination. (Id.) In response, Plaintiff contends that she can establish a prima facie case of gender discrimination using Mr. Marshall and Mr. Salazar as a comparators and that Defendant's proffered reason is pretext for gender discrimination. (Doc. 24.)

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a claim of unlawful discrimination by presenting direct, circumstantial, or statistical evidence of discrimination. Underwood v. Perry Cty. Comm'n, 431 F.3d 788, 793 (11th Cir. 2005). In this case, Plaintiff offers circumstantial evidence in support of her claim that she was subject to unlawful gender discrimination.[10]

---

[10] To the extent that Plaintiff attempts to argue a mixed-motive claim of discrimination, this claim also fails. First, the Court notes that Plaintiff has not actually alleged that she was subject to mixed-motive discrimination. Plaintiff never alleges that her gender was a motivating factor in her termination. Instead, Plaintiff alleges that Defendant's given reason for terminating

14

To assess a discrimination claim based only on circumstantial evidence, the Court employs the framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Burke-Fowler v. Orange Cty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). Under this test, a plaintiff must establish a prima facie case of gender discrimination by proving four elements: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) similarly situated employees outside of plaintiff's protected class were treated more favorably; and (4) she was qualified for the position. Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008); Maynard v. Bd. Of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003). If a plaintiff can demonstrate the elements of a prima facie case, then the burden of production falls to the employer to articulate a legitimate, non-

---

her employment was pretext for an underlying discriminatory motive. Even if Plaintiff had alleged that Defendant had a mixed motive in terminating her employment, her claim would fail because she has not shown any evidence to establish that her gender was considered in the decision to terminate her employment. See Quigg v. Thomas Cty. Sch. Dist., 814 F.3d 1227, 1239 (11th Cir. 2016) (requiring a plaintiff to show "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that her protected characteristic was a motivating factor for an adverse employment decision"). As discussed, Ms. Davis made the decision to terminate Plaintiff's employment after learning from Ms. Stewart that Plaintiff's keys were left in a resident's unit and Plaintiff did not report that the keys were missing. Plaintiff has never alleged any facts that would suggest that Ms. Davis considered her gender in any way in terminating her employment. Without any evidence that the decision to terminate her employment was motivated by gender, the Court is unable to find that there is a mixed motive in terminating her employment.

discriminatory reason for the adverse employment action. <u>Alexander</u> <u>v. Fulton Cty.</u>, 207 F.3d 1303, 1336 (11th Cir. 2000). If the employer articulates a legitimate, non-discriminatory reason, the burden then shifts back to the plaintiff to demonstrate that the employer's stated reason was pretext for discrimination. <u>Id.</u> At this point, if the plaintiff fails to establish the presence of a genuine issue of material fact that the employer's reason was merely pretextual, then the employer is entitled to summary judgment in its favor. <u>Cuddeback v. Fla. Bd. Of Educ.</u>, 381 F.3d 1230, 1235 (11th Cir. 2004).

In this case, the parties do not dispute three of the four factors required to create a prima facie case of discrimination. Rather, the parties only dispute whether Plaintiff can show evidence that similarly situated employees outside of Plaintiff's protected class were treated more favorably by Defendant. In its motion, Defendant argues that Plaintiff has failed to present evidence of similar employee that received more favorable treatment. (Doc. 14 at 20.) In response, Plaintiff argues that Mr. Marshall, a male employee, was treated more favorably because he was not subjected to sexual harassment in the workplace and did not face adverse employment action for violating policy when he directed Plaintiff to give her keys to Mr. Salazar. (Doc. 24 at 6.) Additionally, Plaintiff argues that Mr. Salazar was "permitted to engage in sexual harassment" because he was a male. (<u>Id.</u>)

"[A] plaintiff proceeding under McDonnell Douglas must show that she and her comparators are 'similarly situated in all material respects.' " Lewis v. City of Union City, Ga., 918 F.3d 1213, 1226 (11th Cir. 2019). Specifically, a similarly situated comparator "will have engaged in the same basic conduct (or misconduct) as the Plaintiff . . . ." Id. at 1227. Additionally, a similarly situated employee "will have been subject to the same employment policy, guideline, or rule as the Plaintiff . . . ." Id. After careful review, the Court finds that Plaintiff has failed to establish that Mr. Marshall or Mr. Salazar are "similarly situated in all material respects."

First, the Court is unconvinced that Mr. Marshall is a proper comparator. Plaintiff argues that Mr. Marshall engaged in the same conduct as Plaintiff because he "directed Plaintiff's keys be given to [Mr.] Salazar" in violation of Defendant's policies prohibiting master keys to be given to unauthorized individuals. (Doc. 24 at 6.) Unlike Plaintiff, Mr. Marshall "faced no adverse action" for violating Defendant's policies.[11] (Id.) However, Plaintiff has offered no evidence that Mr. Marshall violated Defendant's

---

[11] Plaintiff argues that she followed Mr. Marshall's instructions because she believed Mr. Marshall was her superior. (Doc. 24 at 1.) In contrast, Mr. Marshall testified that he does not oversee Plaintiff and is not in Plaintiff's chain of command. (Doc. 12, Attach. 5 at 5). Viewing the facts in the light most favorable to Plaintiff, the Court will consider Mr. Marshall to be Plaintiff's superior.

policies by losing, misplacing, or loaning his keys. In fact, Ms. Davis testified that during her employment with Defendant no other employee has left keys in an apartment. (Doc. 12, Attach. 4 at 8.) While Plaintiff may be correct that Mr. Marshall violated policy, he violated a different policy than Plaintiff. Mr. Marshall did not direct Plaintiff to permanently surrender her keys to Mr. Salazar. (Doc. 24 at 6.) Plaintiff failed to regain possession of her keys or report to her direct supervisor that Mr. Salazar had possession of her keys at the end of the day on February 2, 2018. Plaintiff's violation is markedly more serious because misplaced master keys creates a substantial risk of criminal activity on Defendant's properties.

Second, Plaintiff argues that she was treated less favorably than Mr. Marshall and Mr. Salazar because they "were permitted to engage in sexual harassment" in violation of Defendant's policies and did not face repercussions. (Id.) This alleged conduct does not establish that Mr. Marshall and Mr. Salazar are similarly situated to Plaintiff in all material respects because Plaintiff was not terminated for engaging in sexual harassment.[12]

---

[12] To the extent that Plaintiff alleges Defendant is responsible for any sexual harassment committed by Mr. Marshall in his official capacity (Doc. 24 at 8, arguing that Defendant is responsible for Mr. Marshall's actions because he was the Director of Facilities Management), Plaintiff has not asserted this claim in her complaint. The Court will only address claims that Plaintiff asserted in her complaint. Moreover, Plaintiff alleges that Mr. Marshall made one or two comments about her appearance. This

18

Additionally, Mr. Salazar cannot be a proper comparator to Plaintiff because he was not employed by Defendant. Moreover, Mr. Salazar did face consequences for his alleged harassment of Plaintiff. The same day that Plaintiff told Mr. Clark about the incident with Mr. Salazar, Mr. Clark called Empire and requested that Mr. Salazar be removed from Defendant's projects. (Doc. 12, Attach. 1 at 6.) Because Plaintiff has failed to identify a proper comparator, Plaintiff cannot establish a prima facie case of gender discrimination.[13]

---

clearly does not equate to sexual harassment. See Gutherie v. Waffle House, Inc., 460 F. App'x 803, 806 (11th Cir. 2012) (" '[S]imple teasing . . . offhand comments, and isolated incidents (unless extremely serious)' do not constitute a hostile work environment." (internal citation omitted)).

[13] To the extent Plaintiff alleges a sexual harassment hostile work environment claim, this claim also fails. In her response, Plaintiff alleges that she was "subjected to sexual comments . . . [and] sexual advances in the workplace" because of her gender. (Doc. 24 at 6.) Although she does not specifically allege a hostile work environment claim, Plaintiff vaguely bases this claim on the alleged comments made by Mr. Salazar and Mr. Marshall about Plaintiff's appearance and on Mr. Salazar's attempt to kiss Plaintiff. (Id.) However, sexual harassment amounts to sex discrimination "only when the harassment alters the terms or conditions of employment." Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999). Sexual harassment reaches this level when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Hyde v. K.B. Home, Inc., 355 F. App'x 266, 271 (11th Cir. 2009) (internal citation omitted). Plaintiff's allegations do not meet the threshold of "severe or pervasive" harassment. See Gutherie, 460 F. App'x at 806; see also Looney v. Simply Aroma LLC, No. 1:17-00294-N, 2018 WL 1002622, *4 (S.D. Ala. Feb. 21, 2018) (granting summary judgment to the defendant on Title VII sexual harassment claim because attempting to kiss the

19

In the alternative, Defendant argues that even if Plaintiff identified enough evidence to show a prima facie case of discrimination, Plaintiff's claim would still fail because she is unable to show that Defendant's reason for terminating her was pretext for an underlying discriminatory motive. (Doc. 14 at 20.) Specifically, Defendant argues that Plaintiff was terminated for violating Defendant's policy that "employees who possessed master keys were to maintain possession of these keys at all time[s] . . . ." (Id. at 21.) Defendant provides evidence that Plaintiff's keys were found inside an apartment on Friday, February 2, 2018, and returned to Defendant's office on Monday, February 5, 2018. (Doc. 12, Attach. 3 at 27-29.) During this time, Plaintiff failed to inform her supervisor, Ms. Stewart, that the keys were not in Plaintiff's possession. (Doc. 12, Attach. 2 at 43; Doc. 12, Attach. 3 at 10.) Even if Mr. Marshall directed Plaintiff to give her keys to Mr. Salazar and Mr. Salazar misplaced the keys, Plaintiff does not argue that she tried to get her keys back from Mr. Salazar. Plaintiff also did not inform Ms. Stewart that Mr. Marshall directed her to give her keys to Mr. Salazar until after she was terminated. (Doc. 12, Attach. 2 at 43.) Based on Plaintiff's failure to regain possession of the keys and failure to report Mr. Salazar's possession of the keys to Ms. Stewart, the Court

---

plaintiff and reaching across her chest was not severe or pervasive).

concludes that Defendant has proffered a legitimate, non-discriminatory reason for terminating Plaintiff's employment. See Vessels v. Atlanta Ind. Sch. Sys., 408 F.3d 763, 769-770 (11th Cir. 2005) (noting that "[s]o long as the employer articulates a clear and reasonably specific non-discriminatory basis for its actions, it has discharged its burden of production.") (internal quotation marks omitted).

Because Defendant has satisfied its burden to proffer a legitimate, non-discriminatory reason for terminating Plaintiff, the burden now shifts to Plaintiff to establish that Defendant's reason is merely pretext for discrimination. Alexander, 207 F.3d at 1336. "[A] plaintiff may create an issue of fact at the pretext stage by (1) presenting evidence that the defendant's proffered reason is not worthy of belief, thereby enabling the jury to infer that discrimination was the employer's real reason, or (2) presenting evidence that discrimination was, in fact, the employer's real reason." Darity v. MEGA Life & Health Ins. Co., 541 F. Supp. 2d 1360, 1371 (N.D. Ga. 2008)(citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-47, 120 S. Ct. 2097, 2108, 147 L. Ed. 2d 105 (2000)). The district court must determine "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy

of credence." Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks omitted).

Plaintiff argues that Defendant's proffered reason for terminating her employment is pretext for four reasons: (1) Defendant's "witnesses provide conflicting testimony" about the events on February 2 and February 5; (2) Defendant created sham affidavits; (3) Defendant gave the EEOC a position statement that is "contradicted by the rest of the evidence in this case"; and (4) Plaintiff did not lose her keys and, therefore, should not have been terminated for violating policy. (Doc. 24 at 11-13.) These arguments fail to cast sufficient doubt on Defendant's assertion that it terminated Plaintiff for misplacing her keys and failing to report that her keys were not in her possession.

First, Defendant's witnesses did not provide contradictory reasons for Plaintiff's termination. Although Defendant's witnesses may have provided differing accounts about the sexual harassment allegations and communications surrounding such allegations, the Court views these minor differences in the light most favorable to Plaintiff.[14] Defendant's witnesses testified that Plaintiff was terminated due to her keys being found in an

---

[14] Plaintiff claims that Mr. Reed's statements may not be credible because he suffered a stroke in 2016. (Doc. 24, Attach. 1 at 4.) The Court will not make credibility determinations and, therefore, will not discount Mr. Reed's statements altogether.

apartment and her failure to report that the keys were not in her possession. Additionally, Defendant's statement to the EEOC also claimed that Plaintiff was terminated for her failure to maintain possession of the master keys. (Doc. 12, Attach. 4 at 26.)

Second, Plaintiff claims "the fact that Defendant created [affidavits] after depositions, and in support of litigation, is highly indicative of pretext." (Doc. 24 at 13.) However, Plaintiff provides no support for this assertion. Plaintiff generally cites to cases that stand for the assertion that "[e]vidence of a post-hoc attempt to justify an employment decision may be evidence of pretext." Keaton v. Cobb Cty., 545 F. Supp. 2d 1275, 1303 (N.D. Ga. 2008). Defendant did not obtain evidence after Plaintiff's termination to justify its decision to terminate Plaintiff. Defendant's affidavits were not a post-hoc attempt to create a reason for Plaintiff's termination. Instead, Defendant terminated Plaintiff immediately after learning that she left her keys in someone else's possession without notifying her supervisor. Even if Plaintiff's violation was discovered during or contemporaneous with the investigation of Plaintiff's sexual harassment allegation, Plaintiff cannot refute that she violated Defendant's policies. See Lepera v. Cagle's, Inc., 168 F. App'x 917, 919 (11th Cir. 2006) (affirming summary judgment for employer where employee was fired sixteen days after complaining of sexual harassment because the record supported employer's non-retaliatory

justification for termination, which was discovered "during an investigation . . . initiated as a result of her harassment complaint.").

Third, Defendant's EEOC statement does not contradict the evidence in this case. The statement specifies that Plaintiff was terminated for not informing her supervisor that her keys were lost, misplaced, or stolen. (Doc. 12, Attach. 4 at 26.) Additionally, the statement acknowledges that Plaintiff was instructed to give her keys to Mr. Salazar. (Id.) Plaintiff does not establish that Defendant's EEOC statement is unworthy of credence.

Lastly, Plaintiff's argument that Defendant's reason was pretext because she did not actually lose her keys fails. The Court cannot second-guess an employer's non-discriminatory business decisions. Flowers v. Troup Cty., Ga. Sch. Dist., 803 F.3d 1327, 1338 (11th Cir. 2015). Even if Defendant's decision to terminate Plaintiff for misplacing her keys was mistaken, an employer "is not liable for discriminatory conduct" when it "fires an employee under the mistaken but honest impression that the employee violated a work rule." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 n.3 (11th Cir. 1999). Plaintiff failed to identify evidence that Defendant's belief that Plaintiff did not inform her supervisor about the keys was dishonest or pretext for a discriminatory motive. As a result, the Court can find no reason

that Defendant's proffered reason was pretext for discrimination. Defendant is therefore entitled to summary judgment on Plaintiff's claim of gender discrimination.

III. RETALIATION

In her complaint, Plaintiff also alleges that she was retaliated against for engaging in a protected activity by complaining about sexual harassment. (Doc. 1 at 4.) Plaintiff alleges that after making a complaint about Mr. Salazar's attempt to kiss her she was terminated from her employment. (Id.) Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), provides that

> [I]t shall be an unlawful employment practice for an employer to discriminate against any [employee] . . . because he has opposed any practice made unlawful by [42 U.S.C. § 2000e], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

In order to "prove retaliation, an employee must show that: (1) she engaged in protected activity, such as opposing an unlawful employment practice; (2) she suffered an adverse employment action; and (3) a causal connection exists between the activity and adverse action." Quigg, 814 F.3d at 1244 (citing Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 798 (11th Cir. 2000)). "To demonstrate a causal connection between a protected activity and an adverse employment action, the plaintiff must show that: (1) the decisionmakers knew of [the] protected activity; and (2)

the protected activity and adverse action were not wholly unrelated." Harris v. Fla. Agency for Health Care Admin., 611 F. App'x 949, 951 (11th Cir. 2015) (citing Shannon v. Bellsouth Telecomm., Inc., 292 F.3d 712, 716 (11th Cir. 2002)).

Defendant argues that Plaintiff's retaliation claim fails "because she cannot establish the causal relation element of her prima facie case." (Doc. 14 at 22.) "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). Mere temporal proximity, without more, must be "very close." Clark Cty. Sch. Dist. V. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001).

In this case, Plaintiff can show a causal connection between her complaint and her termination.[15] Plaintiff complained to her direct supervisor, Ms. Stewart, about Mr. Salazar's alleged sexual harassment only five days prior to her termination on February 7, 2018. (Doc. 12, Attach. 3 at 7.) Additionally, Plaintiff complained to Mr. Reed, Director of Human Resources, merely two days before Defendant terminated her employment. (Doc. 12, Attach. 7 at 2.) Because of the very close temporal proximity between Plaintiff's

---

[15] The Court notes that Defendant did not argue whether Plaintiff failed to satisfy the other elements of a prima facie case of retaliation. Therefore, the Court will not address the other elements.

complaint and her termination, the Court concludes that Plaintiff has established a prima facie case of retaliation.

As previously discussed, Defendant has offered a legitimate, non-retaliatory reason for terminating Plaintiff—she failed to regain possession of her master keys and failed to inform her supervisor about her keys not being in Plaintiff's possession. Because Defendant has satisfied its burden to proffer a legitimate, non-retaliatory reason for terminating Plaintiff, the burden now shifts to Plaintiff to establish that Defendant's reason is merely pretext for retaliation. Alexander, 207 F.3d at 1336. "[A] plaintiff may create an issue of fact at the pretext stage by (1) presenting evidence that the defendant's proffered reason is not worthy of belief, thereby enabling the jury to infer that discrimination was the employer's real reason, or (2) presenting evidence that discrimination was, in fact, the employer's real reason." Darity, 541 F. Supp. at 1371 (citing Reeves, 530 U.S. at 146-47, 120 S. Ct. at 2108). The district court must determine "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Jackson, 405 F.3d at 1289.

Ultimately, Plaintiff's claim for retaliation fails because she is unable to show that Defendant's proffered reason for

terminating her employment was pretextual. In an attempt to rebut Defendant's proffered reason, Plaintiff provides the same four reasons she previously provided with regards to Plaintiff's discrimination claim as to why this Court should find Defendant's proffered reason is pretext. Those reasons are: (1) Defendant's "witnesses provide conflicting testimony" about the events on February 2 and February 5; (2) Defendant created sham affidavits; (3) Defendant gave the EEOC a position statement that is "contradicted by the rest of the evidence in this case"; and (4) Plaintiff did not lose her keys and, therefore, should not have been terminated for violating policy. (Doc. 24 at 11-13.) As with Plaintiff's gender discrimination claim, none of these reasons establish that Defendant's proffered reason is pretext for an actual retaliatory motive. Defendant consistently argued that it terminated Plaintiff for mishandling her keys and the Court cannot question Defendant's non-retaliatory business decisions. Plaintiff has not identified evidence showing that this reason is unbelievable. As a result, Defendant's motion should be granted on Plaintiff's retaliation claim.

## CONCLUSION

Plaintiff has failed to create a genuine dispute of material fact that Defendant's proffered reasons for her termination were pretextual. As a result, Defendant's Motion for Summary Judgment

(Doc. 12) is **GRANTED** and Plaintiff's complaint is **DISMISSED**. The Clerk is **DIRECTED** to close this case.

SO ORDERED this 24ᵗʰ day of January 2020.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA